W. E. BROWN, Plaintiff-Appellant-Respondent, v. REORGANIZATION INVESTMENT COMPANY, a Corporation, Defendant-Appellant, and THOMAS N. PACKS, Defendant-Respondent.—Nos. 38101, 38245. —166 S. W. (2d) 476.

Division One, November 10, 1942.

*Thomas J. Cole* and *Walter N. Davis* for plaintiff-appellant W. E. Brown in Case No. 38101.

*Leahy, Walther & Hecker* and *William O'Herin* for respondent Thomas N. Packs in Case No. 38101.

*A. B. Lansing* and *Moser, Marsalek & Dearing* for appellant Reorganization Investment Company in Case No. 38245.

*Thomas J. Cole* and *Walter N. Davis* for plaintiff-respondent W. E. Brown in Case No. 38245.

HYDE, C.—This is an action for $20,000 for personal injuries. The jury returned a verdict for plaintiff against the corporate defendant (hereinafter called the Investment Company) but in favor of defendant Packs. The Investment Company has appealed from the judgment entered against it, and plaintiff has appealed only from that part of the judgment exonerating Packs.

Plaintiff's judgment against the Investment Company was for $7416.75, but plaintiff's appeal involves the right to recover $20,000 from Packs. Since both appeals are from the same final judgment, both came to this court. [Walsh v. Southwestern Bell Telephone Co., 331 Mo. 118, 52 S. W. (2d) 839, and cases cited.] We hold that we have jurisdiction of the whole case.

Plaintiff was injured when he tripped over what he claimed was a negligent obstruction in the lobby of the Arena, a building owned by the Investment Company, in which Packs was promoting a wrestling show on that evening. The arrangement between the defendants was oral and allowed Packs the use of the premises for one night shows for 15% of the proceeds, with a guaranteed minimum amount. Plaintiff started to the show with Mr. Housam and his niece Miss Behrens. Plaintiff drove his car and parked it west of the Arena. Mr. Housam preceded plaintiff and Miss Behrens into the Arena lobby, went to the ticket window to the west of the north entrance, and purchased tickets. Plaintiff said that when (walking east) he reached a point just west of the north entrance doors, Mr. Housam was coming away with the tickets. Plaintiff stopped there about two or three feet from a fence-like structure, made of movable wooden structures called "horses," used to provide aisles into the entrance doors. He was facing southwest waiting for Mr. Housam to come back from the ticket window, and these "horses" were behind him.

Plaintiff further related what then occurred, as follows:

"I stopped because I saw he had gotten the tickets and I wanted to pay for them, as I figured they were my guests. . . . He said,

'they are all paid for; that's all right, come on in; we will argue that out when we get in.' As I turned to go in, I turned around and my heel caught on a projection of a wooden horse and I sat down and broke my right hip. . . . I think I took a step backwards. . . . I caught my heel when I turned around. . . . I grabbed that thing and it fell over and it let me down, the end flew up.''

This north entrance had double doors, with a ticket window just west of them. Only one of these doors (the one to the east) was open, at the time plaintiff was injured. The Investment Company employees placed the movable wooden ''horses'' in front of these doors, before they were opened, to fence aisles so that people would come into each door in single file. Packs furnished the ushers and ticket takers, and they finally arranged the ''horses'' after they opened the doors. If the crowd was large enough to require it, both doors could be opened and the ''horses'' arranged to make two aisles. The ''horses'' were constructed of two-by-fours, and were estimated to weigh about 75 pounds each. One side of the ''horse'' made a straight up and down fence (without projections) with a top rail and a cross piece near the floor. (We refer to this side as the front.) On the other side there were legs or supports projecting behind to keep them standing. (We refer to this side as the back.) These legs, projecting back from the horse, consisted of a two-by-four at each end, which rested on the floor and projected back a foot and a half to two feet, with a diagonal support coming up (from each piece resting on the floor) to the top of the front of the structure just below the top rail. Immediately in front of the doors, at the west edge of the east door which was open when plaintiff was injured, two of the ''horses'' had been placed with their backs together so that they made a box-like structure with their supporting projections on the inside of the box. This made a straight up and down fence on the west side of the aisle leading to the east door, and would have likewise made a straight up and down fence for the east side of an aisle to the west door if it should be opened. There was another single ''horse'' on the east side of the east door, with its projecting supports projecting back to the east, with its front making the east side of the aisle to the east door. A fourth ''horse'' was in front of the west door, and could have been used so that its front would have made the west side of an aisle to that door. However, since that door was not opened, this ''horse'' was pushed over to the box-like structure, formed by the two ''horses'' at the west side of the east door, with its front against it and its back toward the ticket window. Thus, its legs projected back into the space which would be used by people coming from the ticket window to this entrance. Plaintiff tripped over the leg of this ''horse'' when he took a step backward to turn toward the entrance. The lobby was well lighted and there was nothing to prevent plaintiff

from seeing how the ''horse'' was constructed and placed; but to determine whether it was fastened to the floor might have required critical examination.

Although it was shown that often many people would be crowding around the ticket window, at the time plaintiff was injured most of the crowd had gone inside and there were only a few stragglers in the lobby. Plaintiff said that, as he approached, he saw the top part of the ''horse'' but he did not look at the foot of it. He said that he did not directly face it as he came in because he was looking at Mr. Housam at the ticket window. He had some money in his hand to pay him for the tickets. The evidence showed that the top rail of the ''horse'' was painted green but that all of the lower part was a neutral color. Both defendants contend that a verdict should have been directed against plaintiff on the ground that there was no negligence shown, because the position and structure of the wooden ''horse'' was open and obvious; and also on the ground that defendant was guilty of contributory negligence as a matter of law, because he did observe and avoid the lower part of the ''horse.''

We think that there was a jury case on both issues. The cases cited and relied on by defendants are not cases concerning ''theatres, shows or public places of amusement.'' ''The care required of the proprietor of a place of public amusement is that which is reasonably adapted to the character of the exhibitions given, the amusements offered, the places to which patrons resort, and also, in some cases, the customary conduct of spectators of such exhibitions; . . . care commensurate with the particular conditions and circumstances involved in the given case.'' [Berberet v. Electric Park Amusement Co., 319 Mo. 275, 3 S. W. (2d) 1025, and cases cited; see also 26 R. C. L. 712, Secs. 4-15; 62 C. J. 863, Secs. 46-59; Annotations 22 A. L. R. 611, 29 A. L. R. 29, 44 A. L. R. 204, 53 A. L. R. 856, 61 A. L. R. 1290, 98 A. L. R. 558.] These authorities also hold that a paying patron of such a place is not required to make a critical examination of the premises to determine their safety but may assume that proper precautions have been taken for his safety by those in charge. [62 C. J. 875, Secs. 68-75; Annotations 22 A. L. R. 616. 29 A. L. R. 30, 53 A. L. R. 857, 61 A. L. R. 1291, 98 A. L. R. 560.] In a place like the outside lobby of the Arena, it could be reasonably anticipated that patrons would be passing through in considerable numbers; that they would be hurrying (especially if late) to get tickets and thereafter to get inside; that they would not be thinking about or taking much notice of the character or construction of the aisles to the ticket takers; and that they might come in contact with the projections of a ''horse'', placed as this one was, in the way of patrons coming from the ticket window to the entrance. [See Crawford v. Kansas City Stock Yards Co., 215 Mo. 394, 114 S. W. 1057; Simmons v. Kansas City Jockey Club, 334 Mo. 99, 66 S. W. (2d) 119; Nephler v. Woodward, 200 Mo. 179, 98 S. W. 488.] It would

have been a simple matter to have moved this "horse" away from the side of the entrance next to the ticket window. It served no useful purpose in that place when the west door was kept closed. It could have been put on the east side of the east door with its back to the single "horse" there, so as to make another box-like structure as did the two "horses" west of the door. In such position, there would have been no projections into the space patrons walked through on either side of the door that was opened. Such an arrangement would have completely eliminated any danger of patrons being tripped by this equipment.

The negligence claimed here was not based alone on having an obstruction projecting into the space where patrons would be walking but also on the insecure character thereof so that if a patron tripped over its projection and took hold of it to regain his balance it would turn over. This added to its dangerous character as an obstruction. Under these surroundings and circumstances, we hold the jury could reasonably find that such insecure and insubstantial equipment, with such projections into the space between the entrance to the aisles they made and the ticket office, was a dangerous obstruction; and that it was negligence to so place or leave one of them. We further hold that the jury could also reasonably find that plaintiff was not negligent under these circumstances, when seeking to get to the ticket office first or insisting on paying Mr. Housam then and there for the tickets, in failing to notice a projection of a neutral color different from the top of the structure; and we cannot say he was guilty of contributory negligence as a matter of law in stepping back and striking it when attempting to turn toward the entrance. [See Newdiger v. Kansas City, 342 Mo. 252, 114 S. W. (2d) 1047, and cases cited; Pettyjohn v. Interstate Heating & Plumbing Co. (Mo. Sup.),. 161 S. W. (2d) 248.]

It is contended by the Investment Company that it is not liable because it had rented the premises to Packs, citing cases, such as Bender v. Weber, 250 Mo. 551, 157 S. W. 570, and Mahnken v. Gillespie, 329 Mo. 51, 43 S. W. (2d) 797. Such cases of usual leases of business buildings and dwellings do not apply to the situation presented here. The rule that should apply is stated by the American Law Institute, Restatement of Torts, Section 359, as follows:

"A lessor who leases land for a purpose which involves the admission of a large number of persons as patrons of his lessee, is subject to liability for bodily harm caused to them by an artificial condition existing when the lessee took possession, if the lessor

"(a) knew or should have known of the condition and realized or should have realized the unreasonable risk to them involved therein, and

"(b) had reason to expect that the lessee would admit his patrons before the land was put in reasonably safe condition for their reception."

. This rule is supported by the overwhelming weight of authority.. Thus it is stated in 62 C. J. 871, Section 61:

"One who leases premises to be used as, or in connection with, a place of public amusement is liable for injuries to a patron caused by their defective and unsafe condition, where he knew or, in the use of reasonable care or diligence, could have known of such condition, and especially is this so where the short and interrupted character of the lessee's occupation made it obvious that the safety of the premises must be left mainly to the lessor."

So also it is said in 26 R. C. L. 716, Section 16:

"In regard to a building or other structure in which public exhibitions and entertainments are designed to be given, and for admission to which the lessor receives compensation, directly or indirectly . . . the lessors or owners of the buildings or structures hold out to the public that the structures are reasonably safe for the purposes for which they are let or used, and impliedly undertake that due care has been exercised in the erection of the buildings. And the owner of such premises is not relieved of the duty referred to by temporarily leasing the property to another for a single public entertainment."

This rule is discussed and cases supporting it collated in the following A. L. R. Annotations: 22 A. L. R. 624; 29 A. L. R. 31; 44 A. L. R. 205; 53 A. L. R. 858; 61 A. L. R. 1293; 98 A. L. R. 562. [See also Douglas v. Lang (Mo. App.), 124 S. W. (2d) 642; Murphy v. Electric Park Amusement Co., 209 Mo. App. 638, 241 S. W. 651; Hollis v. Kansas City Retail Merchants' Assn., 205 Mo. 508, 103 S. W. 32; Young v. Waters-Pierce Oil Co., 185 Mo. 634, 84 S. W. 929.] Here the arrangement with Packs was for a one night show. The Investment Company not only furnished the "horses" as equipment to be used in making aisles to the entrance doors, but actually set them in place for such use in front of these doors. Thereafter, they were. pushed back by the ticket takers only enough to get the doors open and then moved back where Investment Company employees had put them. In short, they were placed and used at the very spot and in the exact manner that the lessor intended. We, therefore, hold that the Investment Company is liable for any unsafe condition created by such use of this equipment.

The Investment Company next contends that plaintiff's instruction No. 1 is error on the grounds that it contains unwarranted assumptions of fact; that it omits essential findings of fact; and that it is confusing. After hypothesizing preliminary matters, this instruction continued thus:

"And that said corporation and said Packs, with full knowledge of the use to which said building was to be put, caused to be placed, or allowed to remain, in the areaway or lobby of said building certain wooden horses with a leg extending therefrom as much as eighteen

inches or more and that said wooden horse or horses were not fastened to the floor so as to prevent them from upsetting and injuring persons who might be tripped thereby, if you so find; then if you further find and believe from the evidence that defendant's action in so setting said horses or in so allowing them to remain in said areaway or lobby was negligent and careless, if you so find, and that plaintiff by reason thereof and while in the exercise of ordinary care for his own safety, if you so find, was directly caused to stumble or trip over the leg of one of said wooden horses, if you so find, and on that account and because said horse was not fastened to the floor, if you so find, plaintiff was thus caused to fall, if you so find, and be injured, if so, then your verdict should be for the plaintiff.''

We find no merit in defendant's claim that this instruction assumes ''that if they had been fastened they would not have injured persons''; and that ''it was the upsetting of the horse which injured plaintiff.'' As above noted, the charge of negligence was based on both the obstruction of the projections so as to trip patrons and the insecure character of the ''horse'' which would make it likely to upset if one did trip over it, and thus make it more likely to cause a fall from which injury would result. In short, that it was negligence to leave such an unfastened wooden structure with such projections at such a place. This instruction commences ''If you find and believe from the evidence'' and follows the hypothesized portion which defendant criticises with ''if you so find.'' [See Lewis v. Illinois Central R. Co. (Mo. Sup.), 50 S. W. (2d) 122; Willard v. Robertson (Mo. Sup.), 129 S. W. (2d) 911.] We hold that it cannot reasonably be construed as assuming controverted facts.

The second contention concerning this instruction is that ''it does not require the jury to find, as a predicate to liability, that the 'horse' created danger of injury''; or that ''defendant knew or by the exercise of ordinary care should have known that persons were likely to be injured because of the matters complained of''; or that ''the premises were not in a reasonably safe condition.'' Defendant cites State ex rel. City of Jefferson v. Shain, 344 Mo. 57, 124 S. W. (2d) 1194. There plaintiff claimed to have fallen because of a defective sidewalk. In that case, the alleged defect was a slight depression ''caused by one block or section of the sidewalk being lower than the other.'' Plaintiff's main instruction did not require a finding that the sidewalk was not in a reasonably safe condition. This was held to be prejudicial error. Sidewalks are not required to be kept perfectly smooth and absolutely level. [See O'Malley v. City of St. Louis, 343 Mo. 14, 119 S. W. (2d) 785, and cases cited.] Just how large a depression, hole or slope will constitute an unsafe condition of a sidewalk is usually a jury question, and must be submitted as such. In such a case, the instruction must not assume that a small defect created a dangerous condition. A similar case is Nephler

v. Woodward, 200 Mo. 179, 98 S. W. 488, where there was a small hole in the carpet on the aisle of a dimly lighted theater. This court said that, in such a case, an instruction must not treat "the hole in the carpet and the dim light as it would treat facts which constitute an obvious danger," like leaving a "cellar door open in a public sidewalk on a dark night." This court also said that "in submitting the question to the jury they ought not to be left to judge by the result alone that it was dangerous, but should be instructed that although they might find that it resulted in the injury in this instance, yet the defendants would be liable as for neglect of duty only in case the condition was such that reasonably prudent men engaged in that business would, by the exercise of ordinary care, foresee or anticipate the danger." It was, however, held that the failure of the main instruction to make this clear to the jury was cured by the positive requirements stated in another instruction.

Plaintiff's instruction here is not as clearly worded and definite as it could be. However, it submits a factual situation much different from a small hole in a carpet or a slight unevenness between two sections of a sidewalk. Of course, an instruction should not authorize a finding of negligence upon those facts alone, but should make clear that the basis of negligence in such situations must be that those slight defects created an unsafe condition in view of other circumstances found to exist. However, a large obstruction in a place of public travel, which has projections likely to trip people and then upset with them, obviously creates a situation from which injury to others is much more to be anticipated. Therefore, we think plaintiff's instruction here would reasonably be construed as requiring the jury to find that unfastened and unstable (likely to upset) wooden structures, with legs extending therefrom so that persons might be tripped thereby, were placed or allowed to remain in the lobby with full knowledge of the public use to which the building was to be put. This would constitute such an unsafe condition that the further findings that it was negligent and careless to create, or to continue this situation, and that this directly caused plaintiff (exercising ordinary care) to trip, fall and be injured, would be warranted by the finding of these facts thus submitted. [For discussion of similar criticism made against the plaintiff's main instruction in Mick v. John R. Thompson Co. (Mo. App.), 77 S. W. (2d) 470; see also Raymond, Missouri Instructions, 8375; Jenkins v. Missouri State Life Ins. Co., 334 Mo. 941, 69 S. W. (2d) 666; Murphy v. Fred Wolferman, Inc., 347 Mo. 634, 148 S. W. (2d) 481.] Furthermore, plaintiff's instruction No. 2 stated: "It is sufficient on such issues (previously stated as "negligence and liability of defendants under the instructions given you") if you find from the credible evidence that said defendants knew, or by the exercise of ordinary care should or could have known, that injury to someone would likely result as a reasonable

and natural consequence of their negligence, if you so find from the credible evidence that defendants were so negligent." This clearly supplies the requirement of finding that defendants "would, by the exercise of ordinary care, foresee or anticipate danger," stated in Nephler v. Woodward, supra. Defendant criticises this instuction, saying it is misleading and erroneous because this last part tells the jury to "find the defendants negligent if you believe they knew their negligence would hurt someone, provided you find them negligent." The final proviso was plainly only another form of the much interpolated "if so" or "if you so find" used to guard against the claim of assuming facts, and the first part of the instruction refers to negligence submitted in other instructions. We think that the jury would understand the charge of negligence so submitted and hold that these instructions were not prejudicially erroneous.

■ On plaintiff's appeal against Packs, error is assigned on giving instruction No. 10, as follows:

"The Court instructs the jury that if you find and believe from the evidence that at the time of the accident mentioned in the evidence the wooden horses ■ which were used to form an aisle and over one of which plaintiff claims to have tripped, were not on said occasion under the control of defendant Thomas N. Packs and were not placed there or arranged in a position they were at the time of the accident by an employee of defendant Thomas N. Packs or by any one subject to his direction or control or of his agents or servants, then plaintiff cannot recover against Thomas N. Packs and your verdict must be for said defendant."

Plaintiff's contention that "the evidence did not justify a finding by the jury that the wooden horses were not under the control of said defendant"; and that "it was his nondelegable duty to exercise ordinary care to protect the invitees and see to it that they were not subjected to risks of injury," from a condition such as shown here. We think these contentions must be sustained. (The Investment Company had the same instruction authorizing a verdict in its favor, so that the jury would have been permitted to find that no one was in control of this equipment.) We have quoted the rule of the Restatement of Torts as to the liability of the lessor. This does not prevent the lessee also being liable, if there is concurrent negligence of each based upon a duty each owes to plaintiff. Section 343 thereof states the general rules of liability of possessors of land to business visitors and Section 387 states the rule as to an independent contractor who has entire charge. [See Lambert v. Jones, 339 Mo. 677, 98 S. W. (2d) 752, for discussion of Missouri cases; for cases in which liability of both lessor and lessee has been sustained see Kelly v. Laclede Real Estate & Investment Co., 348 Mo. 407, 155 S. W. (2d) 90; Walsh v. Southwestern Bell Tel. Co., 331 Mo. 118, 52 S. W. (2d) 839.] Certainly Packs went into control when he installed his ticket sellers,

ticket takers and ushers, and authorized them to open the doors to admit the public. He then commenced to use the Arena and all its equipment which he had rented for that evening. He then owed his patrons at least the duty to exercise reasonable care to discover and remedy such conditions as the jury could reasonably find were apparent obstructions on the premises or obviously unsafe arrangement of the movable equipment which he intended to use in receiving and accommodating them. [62 C. J. 874, Sec. 64; 26 R. C. L. 716, Sec. 16; Annotations 22 A. L. R. 628; 44 A. L. R. 205; 53 A. L. R. 858; 61 A. L. R. 1293; 98 A. L. R. 562; see also Young v. Waters-Pierce Oil Co., 185 Mo. 634, 84 S. W. 929.] Packs said he did make an inspection of the areaway as they were selling tickets and "didn't consider those ("horses") an obstacle as they were there for some purpose." This admission is sufficient to show his knowledge of the situation before plaintiff was injured. Moreover, he had used the Arena many times before for such public exhibitions when these "horses" were so used, and he makes no claim that he did not intend that they be so used on the evening plaintiff was injured. In fact he said: "I can explain why they should be in this position (as on that evening): In order to close one door and have only an entrance to one door alone." As we have noted, it is clear that this could have been done by moving the west "horse" to the east side of the open door with its back to the other "horse" there, so that there would have been no projections on either side of the door into the space over which patrons would walk.

■ Packs makes the contention that the ticket takers, who finally arranged the "horses," were not his employees but the employees of an independent contractor. Packs did arrange with a man, who operated such a service, for ticket takers and ushers for an agreed amount for each exhibition. Packs paid their employer who paid them. However, it is not controlling as to Packs' liability whose employees set these "horses" in front of the door or moved them into final position in front of the door. What is important is that there is evidence to show Packs rented this equipment with the Arena, knew how it was placed, and intended that it be so used to make aisles in front of the door. There is no evidence to show that the Investment Company carried on any other activities after the doors were opened or had any further part or interest in the exhibition except to get 15% of the proceeds. We hold that Packs would be liable if he permitted this equipment to be used in a way that he could have reasonably anticipated might cause patrons to be tripped and injured by the way it was arranged (especially when there was obviously a way to arrange it which would have been safe) if by reasonable care, in his admitted inspection of the premises, he could have discovered and prevented the existence of such situation. We, therefore, hold that ■ instruction No. 10 was erroneous and prejudicial as to plaintiff.

Since plaintiff seeks to hold liable two defendants as joint tort feasors for a single injury, there must be one final judgment in the same amount against both, if both are found liable; but, since there is no claim of excessive verdict or improper instructions as to measure of damages, a new trial should not be required on that issue. [Hoelzel v. Chicago, R. I. & P. R. Co., 337 Mo. 61, 85 S. W. (2d) 126; Yerger v. Smith, 338 Mo. 140, 89 S. W. (2d) 66; Lambert v. Jones, 339 Mo. 677, 98 S. W. (2d) 752.] The judgment is reversed as to all defendants and the cause remanded with directions to hold in abeyance the verdict as to both liability and amount of damages against defendant Reorganization Investment Company until the case is disposed of as to the liability of defendant Packs, and then to enter judgment for the amount of the verdict held in abeyance against defendant Reorganization Investment Company, and also against defendant Packs if finally found liable, but for his discharge if there is a verdict in his favor. *Bradley* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur except *Hays, J.,* absent.